**DIGITAL EQUIPMENT CORPORATION,**
Plaintiff,

v.

**ALTAVISTA TECHNOLOGY,**
**INC., Defendant.**

No. 96–12192–NG.

United States District Court,
D. Massachusetts.

March 12, 1997.

458

Shepard M. Remis, Victoria C. DeMaret, Goodwin, Procter & Hoar, Boston, MA, for Digital Equipment Corp.

Mark Schonfeld, Ieuan–Gael Mahony, Sherburne, Powers & Needham, Boston, MA, for AltaVista Technology, Inc.

## MEMORANDUM AND ORDER

GERTNER, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ................................................ 458

II. BACKGROUND ................................................ 459

III. PERSONAL JURISDICTION .......................................... 461
   A. Burden Of Proof.................................................. 461
   B. Personal Jurisdiction And The Internet................................ 462
   C. Methods Of Determining Personal Jurisdiction ......................... 463
   D. The Massachusetts Long–Arm Statute .................................. 464
      1. ATI's Transaction Of Business In Massachusetts .................... 464
      2. ATI's Alleged Tort Caused By Acts In Massachusetts ................. 466
      3. Alleged Tort Caused By Acts Outside Massachusetts.................. 467
   E. Constitutional Due Process Concerns.................................. 468
      1. Relatedness ................................................ 468
      2. Purposeful Availment ......................................... 468
      3. "Reasonableness" Test (Featuring Gestalt Factors) ..................... 470
         a. The "Onerous" Burden Of Appearance............................. 471
         b. Massachusetts's Interest In This Lawsuit .......................... 471
         c. The Convenience Of This Particular Venue ......................... 471
         d. The Administration Of Justice .................................. 471
         e. Some Pertinent Policy Arguments ............................... 471
   F. Other Internet Personal Jurisdiction Cases ............................ 472

IV. PRELIMINARY INJUNCTION .......................................... 472
   A. Preliminary Injunction Standard...................................... 472
   B. Breach Of The Trademark License..................................... 473
      1. Terms of the "AltaVista" License Agreement ......................... 473
      2. ATI's Breach(es) Of The Licensing Agreement ....................... 475
   C. Trademark Infringement And Unfair Competition ........................ 476
      1. Similarity Of The Two "AltaVista" Marks........................... 477
      2. Similarity Of The Goods And Services.............................. 477
      3. Channels Of Trade/Advertising/Marketing .......................... 477
      4. Actual Confusion ............................................ 477
      5. ATI's Intent In Adopting The "AltaVista" Mark ...................... 478
      6. The Strength Of The "AltaVista" Mark............................. 478

V. CONCLUSION ................................................... 478

---

## I. INTRODUCTION

This case involves a dispute between two corporations over rights and commercial interests on the Internet.[1] Both parties operate electronic services and distribute soft-

1. For more general information about the Internet, *see generally, ACLU v. Reno,* 929 F.Supp. 824, 830–38 (E.D.Pa.1996).

ware over the Internet. The plaintiff, Digital Equipment Corporation ("Digital"), has brought suit against defendant AltaVista Technology, Incorporated ("ATI"), for breach of a trademark licensing agreement, trademark and servicemark infringement, unfair competition, and trademark dilution.

Digital owns an Internet and World Wide Web "search-engine" service known as Alta-Vista.[2] Digital purchased ATI's rights in its trademark "AltaVista"; Digital then licensed back to ATI the right to use "AltaVista," in certain defined ways, as part of both ATI's corporate name and its Uniform Resource Locator ("url"), "http://www.altavista.com."[3] The license precludes ATI from using Alta-Vista as "the name of a product or service offering."

Digital seeks a preliminary injunction, claiming that ATI's Web-site breaches its licensing agreement and infringes its trademark rights in "AltaVista." ATI opposes Digital's motion on the merits and moves to dismiss for lack of personal jurisdiction.

First, I find that this Court has jurisdiction over ATI, whose Web-site, in the context of the specific facts of this case, meets both the statutory and constitutional standards. Second, I find that Digital has met the requisite standards for a preliminary injunction.

ATI is hereby **ENJOINED** from using the trademark AltaVista in any way that does not comport with the specific terms of the licensing agreement, as set forth in the opinion below and the accompanying Order.

## II. *BACKGROUND*

In December, 1995, Digital, a Massachusetts corporation, launched an Internet search service using the servicemark "Alta-Vista." Since that time, Digital's AltaVista Internet search service has become one of the leading search services on the Internet and, indeed, one of the most frequently visited sites on the World Wide Web ("Web"). Currently, Digital's AltaVista Web-site receives millions of "hits" (or visits) per day. Digital also markets and sells computer software products and services related to the Internet under names such as AltaVista Directory, AltaVista Firewall, AltaVista Forum, AltaVista Mail, etc. Its marketing strategy, however, did not then include soliciting advertising revenues from advertisers on its Web-site.

At the same time, Digital claims two sources for its right to use the service and trademark "AltaVista": its own use of the mark under common law, and its acquisition by assignment of ATI's trademark rights in AltaVista.

ATI is a California corporation, formerly known as Tree Full of Owls, Inc.; it changed its name to AltaVista Technology, Inc., by amendment to its Articles of Incorporation, in May of 1994. In March of 1996, Digital paid for an assignment of ATI's rights to the trademark AltaVista; it immediately licensed-back to ATI the right to use AltaVista both as part of ATI's corporate name, AltaVista Technology, Inc., and as part of ATI's Web-site address "www.altavista.com." The license agreement, however, precludes ATI from using "AltaVista" as "the name of a product or service offering."

The scope and meaning of this license are hotly contested by the parties. ATI contends that its agreement with Digital was formed with the specific intention of allowing it to benefit from the popularity of Digital's

---

**2.** A "search engine" is the software and database architecture that allows a user to search the World–Wide Web ("the Web"). The Web, "fast becoming the most well-known" way of using the Internet, consists of a series of displayed documents which can contain text, images, sound, animation, moving video etc. *See ACLU v. Reno*, 929 F.Supp. at 836. A group of related documents sharing a Web "address" is commonly called a "Web-site." A "search service" refers both to the search engine software and the way the search service appears to users. Search services are often used to find information or locate sites on the Web. For more information about the Web and Web-sites, *see generally Shea v. Reno*, 930 F.Supp. 916, 929 (S.D.N.Y.1996) (World Wide Web refers to the collection of sites available on the Internet).

**3.** The url is the domain name of a host computer. A domain name functions as an address on the Internet, *see MTV Networks v. Curry*, 867 F.Supp. 202, 204 nn. 1–2 (S.D.N.Y.1994). Those who are connected to the Internet can access a Web-site or a person's electronic mail address by way of its domain name. *Id.*

AltaVista, and the strong brand identity the "AltaVista" search service had created. In contrast, Digital maintains that ATI's licensing agreement strictly limited ATI's ability to use "Altavista"—as part of its corporate name and its url—and not as "the name of a product or service offering."

Consistent with its broad interpretation of the agreement, ATI dramatically changed the appearance of its Web-site,[4] moving it markedly closer to the appearance of Digital's AltaVista Web-site.[5] By the time this lawsuit was brought by Digital, ATI's Web-site looked like, and could effectively function as, Digital's AltaVista search service.

As of May 22, 1996, less than two months after the Digital–ATI agreement, a visitor to "www.altavista.com," ATI's Web-site, would see the word "AltaVista" by itself at the top of the page, apparently not attached to ATI's corporate name. One would see an offer of free ATI software. Using a link,[6] one could "click"[7] to receive "demo versions of AltaVista software."[8] One would also have been offered a link to an unnamed "Search Engine" where one could "Search the Internet . . ." This link was to Digital's AltaVista search service.

By August 8, 1996, ATI's page changed again. Again, the visitor would see the word "AltaVista" at the top of the page, again not as part of ATI's corporate name. Below that there was a banner ad[9] selling an unrelated party's products. This time, however, directly beneath the "Search Engine" line were the words "Digital's Alta Vista," rather than merely "Search the Internet . . ."

On the same date as these changes were implemented, Digital's trademark counsel, Lawrence Robins ("Robins") sent ATI's president, Jack Marshall, a letter claiming that the appearance of ATI's Web-site constituted a breach of Clause 1.1 of their license agreement. The letter states:

> Use of the "AltaVista" logo, without the additional language "Technologies, Inc." is a violation of Paragraph 1.1 of the Agreement. The sole license granted therein is to use "AltaVista" as part of the corporate name "AltaVista Technologies, Inc." and as part of the url "http://www.altavista.com."

Robins claimed that *any* use by ATI of "Altavista," including using it as the name of a product or service on ATI's Web-site, and apart from its use as part of ATI's corporate name and as the url of ATI's Web-site, constituted a breach of Clause 1.1.

> Clause 1.1 of the license agreement says: Digital hereby grants to ATI a nonexclusive, nontransferable license to use the trademark "ALTAVISTA" (the "Mark") as part of the corporate name "Altavista Technologies, Inc." and as part of the url "http://www.altavista.com," and in accordance with and subject to the terms and conditions of this Agreement, provided that nothing in this agreement shall prohibit Digital or any of its direct or indirect majority-owned subsidiaries from using the Mark or from offering products or services under such Mark to third parties.

4. Throughout the course of this opinion "ATI's Web-site" refers to the Web-site accessible via the domain name "www.altavista.com."

5. Before the assignment, ATI's Web-site had a distinctively Western theme and motif: the product offered on the site was called "MediaWrangler"; it featured a representation of a horse and the greeting "Howdy Pardner!" An "AltaVista" mark was prominently displayed at the top of the page.

6. A "link" or "hyperlink" is "highlighted text or images that, when selected by the user, permit him to view another, related Web document." *Shea,* 930 F.Supp. at 929. Using links "a user can move seamlessly between documents [or sites], regardless of their location . . . ." *Id.*

7. To "click," in Internet parlance, is to point the mouse or cursor on a given space or group of words and then literally to click by pushing a button; to click on a "link" on a Web-site is to then be "transported" to that spot. Thus, if a visitor were to "click" on the highlighted text "**Download free demo versions of AltaVista software,**" one would likely be transported to the place in the network where one could proceed to have a "demo" of that software electronically transmitted to one's own computer.

8. ATI's software allowed one to design and create Web-pages.

9. "Banner ads" are advertisements that are often active links to Web-sites in which a product or service is advertised. *See Banner Ads On Internet Attract Users,* N.Y. Times, December 3, 1996, at D1.

This License does not grant ATI the right to use the Mark as the name of a product or service offering.

At the same time, Robins put ATI on notice of the possible termination of their license agreement pursuant to Clause 3.1. Clause 3.1 of the licensing agreement deals with quality control: "all products sold and services rendered while using the Mark shall be ... of such style, appearance and ˙ ˙ality as to protect and enhance the Mark ˛ ˙˙˙ the goodwill associated therewith." [10]

A month later, on September 5, 1996, a visitor to ATI's Web-site would have been greeted by "Altavista" in large, bold letters at the top of the page, with "Technology" immediately under it in smaller, plain type; beneath this was a banner ad and link through which one could "Search the Net with AltaVista" (again, presumably, but not explicitly, Digital's search service) by "Click[ing] here." [11] In addition, the site retained a second, clearly designated link to Digital's AltaVista search site, as well as ATI's AltaVista logo by itself in bold near the bottom of the page.

By October 28, 1996, three days before Digital brought its present motion for preliminary injunction, ATI's Web-site had been altered again: beneath the AltaVista logo in big, bold letters (with a small, plain "Technology" placed immediately below it) sat a "banner ad" for an unrelated product; beneath the banner ad is a solicitation encouraging one to "Click here for advertising information-reach millions every month!" Immediately below that sits an almost identical graphical representation of Digital's AltaVista search engine interface (i.e. the appearance of Digital's AltaVista Web-site, includ-

ing the logo, etc.). Below that is a statement informing users that they can "Search with Digital's AltaVista" (using Digital's AltaVista search engine while still, to all appearances, being at the ATI Web-site). In short, a visitor to ATI's site could easily have the impression that they were *actually* at Digital's AltaVista site.[12]

By October 28, 1996, ATI's Web-site was designed to look, feel, and function very much like Digital's AltaVista Web-site. At the same time, ATI derived revenues from the site and its ties to Digital's Altavista. It displayed banner ads and solicited other advertisers, who could get information about how they, too, could reach millions of users everyday by advertising on ATI's Web-site. Digital expressly eschewed providing advertising space to others for its Web-site at that time.

Digital claims that ATI's Web-site is now a service that provides both a search engine, and advertising space. ATI thus breaches the license agreement by attaching the word "AltaVista" to both of these services. Digital further contends that ATI's Web-site infringes Digital's trademark rights in AltaVista, and that the ATI site constitutes unfair competition both under the Lanham Act § 43(a) and at common law. ATI argues its usage of AltaVista is permitted by its license with Digital. It also contends this Court lacks personal jurisdiction over it.

## III. *PERSONAL JURISDICTION*

### A. *Burden Of Proof*

ATI has moved under Fed.R.Civ.P. 12(b)(2) to dismiss for lack of personal juris-

---

**10.** While Digital's quality control claim might seem to concede that ATI had some right to use the "AltaVista" mark, a closer examination of the license agreement shows this is not likely to be the best interpretation of Clause 3.1. The crucial portion of the license agreement, Clause 1.1, is discussed more fully in the preliminary injunction section of this opinion.

**11.** This space contained banner ads on August 8, 1996 and on October 28, 1996. On September 5, 1996, there appeared to be a banner ad for Digital's AltaVista search service (with the link superimposed on Digital's "Altavista" mountain range logo). On October 28, 1996, this space

contained a banner ad for Auto–By–Tel, a service whereby one could "Buy and insure new cars and trucks on line."

**12.** This impression is created by a Web technique known as "framing." Framing refers to the process whereby one Web site can be visited while remaining in a previous Web-site. Thus, while still appearing to be at ATI's site, and while still able to view its advertising, one could now have traveled to Digital's site, which would appear inside the "frame" of ATI's site. *See* Maura Welch, *Framing the News*, BOSTON GLOBE, February 27, 1997, at D4.

diction over it. Digital, as the plaintiff, bears the burden of demonstrating both that ATI's conduct satisfies Massachusetts's (the forum state's) Long–Arm statute, and that the exercise of jurisdiction pursuant to this statute "comports with the strictures of the Constitution." *Foster–Miller, Inc. v. Babcock and Wilcox Canada,* 46 F.3d 138, 144–45 (1st Cir.1995) (quoting *Pritzker v. Yari,* 42 F.3d 53, 60 (1st Cir.1994); other citations omitted).[13] Though ATI acknowledges that it has a contract with Digital, a Massachusetts corporation, which contract gives rise to this litigation, it contends that *in toto* it has insufficient "minimum contacts" with Massachusetts to allow this Court to assert jurisdiction over it. I disagree. Digital has met its burden.

### B. *Personal Jurisdiction And The Internet*

Regardless of whether this is a diversity case based on breach of contract, or a case involving a federal question such as trademark infringement,[14] I find the assertion of jurisdiction over ATI by this Court to be entirely appropriate. I so conclude under the traditional approaches dictated by the Supreme Court and First Circuit precedents, approaches which have been characterized as "territorially based."[15] I have evaluated the totality of ATI's minimum contacts with Massachusetts—a contract with a Massachusetts corporation, reflecting an agreement to apply Massachusetts law, soliciting business through its Web-site, including Massachu-

setts business, and three sales to Massachusetts residents, etc.

At the same time, I cannot ignore the fact that the medium through which many of the significant Massachusetts contacts occurred is anything but traditional; it is a site in cyberspace, a Web-site. It has been said that the Courts have had to re-evaluate traditional concepts of personal jurisdiction in the light of the increasing globalization of the economy. *See CompuServe v. Patterson,* 89 F.3d 1257, 1262 (6th Cir.1996). The commercial use of the Internet tests the limits of these traditional, territorial-based concepts even further.

The Internet has no territorial boundaries. To paraphrase Gertrude Stein, as far as the Internet is concerned, not only is there perhaps "no there there," the "there" is *everywhere* where there is Internet access. When business is transacted over a computer network via a Web-site accessed by a computer in Massachusetts, it takes place as much *in* Massachusetts, literally or figuratively, as it does anywhere. As one commentator noted:

> The Internet breaks down barriers between physical jurisdictions. When a buyer and seller consummate a commercial transaction through a World Wide Web site, there is no need for the traditional physical acts that often determine which jurisdiction's law will apply and whether the buyer or seller will be subject to personal jurisdiction in the courts where the other is located.

---

**13.** The Supreme Judicial Court of Massachusetts has interpreted Massachusetts's long-arm statute as "an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States." *Good Hope Industries, Inc. v. Ryder Scott Co.,* 378 Mass. 1, 6, 389 N.E.2d 76 (1979); *see Foster–Miller,* 46 F.3d at 144 n. 3. As the First Circuit has suggested in *Foster–Miller,* however, the satisfaction of the Massachusetts long-arm statute does not necessarily satisfy the constitutional due process requirement of "reasonableness," discussed *infra.* 46 F.3d at 144 n. 3.

**14.** *See U.S. v. First Nat. City Bank,* 379 U.S. 378, 381, 85 S.Ct. 528, 530, 13 L.Ed.2d 365 (1965) (applying forum state's long-arm statute in a federal question case); *DeJames v. Magnificence Carriers,* 654 F.2d 280, 283 (3d Cir.), *cert. denied,*

454 U.S. 1085, 102 S.Ct. 642, 70 L.Ed.2d 620 (1981) (holding Fed.R.Civ.P. 4 requires Federal District Courts to apply the long-arm statute of the state in which they sit in effecting service of process in federal question cases); *Editorial Musical Latino Americana v. Mar Int'l Records, Inc.,* 829 F.Supp. 62, 64 (S.D.N.Y.1993) (same). *See also United Electrical, Radio and Machine Workers v. 163 Pleasant Street Corp.,* 960 F.2d 1080, 1086 (1st Cir.1992) ("the minimum contacts doctrine, while imposing no direct state-by-state constraint on a federal court in a federal question case, acts indirectly as a governing mechanism for the exercise of personal jurisdiction").

**15.** David R. Johnson and David G. Post, *Law and Borders—The Rise of Law in Cyberspace,* 48 Stan. L.Rev. 1367, 1369–71 (1996) [hereinafter *"Law and Borders"*].

Bradley A. Slutsky, *Jurisdiction Over Commerce on the Internet,* available at http://www.kslaw.com/menu/jurisdic/html, (page 2).[16] On the Internet, "[m]essages can be transmitted from any physical location to any other location ... without any physical cues or barriers that might otherwise keep certain geographically remote places and people separate from one another." *Law and Borders,* 48 Stan.L.Rev. at 1370–71.

The change is significant. Physical boundaries typically have framed legal boundaries, in effect creating signposts that warn that we will be required after crossing to abide by different rules. *Id.* To impose traditional territorial concepts on the commercial uses of the Internet has dramatic implications, opening the Web user up to inconsistent regulations throughout fifty states, indeed, throughout the globe. It also raises the possibility of dramatically chilling what may well be "the most participatory marketplace of mass speech that this country—and indeed the world—has yet seen." *ACLU v. Reno,* 929 F.Supp. 824, 881 (E.D.Pa.1996). As a result courts have been, and should be, cautious in applying traditional concepts.

Given the very new and unique nature of the technology, this Court will take heed of a Supreme Court plurality's recent recognition "of the changes taking place in the law, the technology, and the industrial structure, related to telecommunications, [that] we believe [make] it unwise and unnecessary definitively to pick one analogy or one specific set of words now." *Denver Area Educational Telecommunications Consortium, Inc. v. FCC,* —— U.S. ——, ——, 116 S.Ct. 2374, 2385, 135 L.Ed.2d 888 (1996) (Breyer, J., plurality opinion) (citation omitted); *see also* Cass R. Sunstein, *Forward: Leaving Things Undecided,* 110 Harv.L.Rev. 6, 30–33 (1996) (approving of Justice Breyer's refusal to lay down a broad rule in *Denver Area Consortium* as an example of a reasonable, "minimalist" judicial approach to contentious questions regarding rapidly changing technologies).

While this case raises some of these concerns, they are not, in the final analysis, dispositive. There is no issue of inconsistent regulations suddenly imposed on Web users without notice. There is no issue of parties being haled into the courts of a given jurisdiction solely by virtue of a Web-site, without meaningful notice that such an outcome was likely. Nor is there a great risk of chilling the Internet's "participatory marketplace" by affirming jurisdiction here.

The parties at bar are corporations who have attempted to tame the "Wild West" of the Internet through their private ordering. They have entered into a contract governing their commercial activities *on the Internet.* Digital sought (and indeed bought) all rights to a trademark identifying its search engine, with certain express exceptions; ATI agreed to enter into a licensing agreement. They both agreed that Massachusetts law would apply to its provisions. While ATI may have tried to structure its relationship with Digital so that it would not be susceptible to jurisdiction in Massachusetts, its subsequent Web activities bring ATI "over the line," and render jurisdiction appropriate.

This case does not reach the issue of whether *any* Web activity, by anyone, absent commercial use, absent advertising and solicitation of both advertising and sales, absent a contract and sales and other contacts with the forum state, and absent the potentially foreseeable harm of trademark infringement, would be sufficient to permit the assertion of jurisdiction over a foreign defendant. While it raises some troubling issues, and while the traditional analyses must be informed by this new technology, ultimately, this is not the day nor the forum to resolve them.

**C. *Methods Of Determining Personal Jurisdiction***

The First Circuit has outlined three approaches to a motion to dismiss for want of personal jurisdiction. *Foster–Miller,* 46 F.3d at 145. The *prima facie* standard, obliges the plaintiff "to adduce evidence of specific facts," beyond the pleadings which the court

---

**16.** Earlier versions of this article were published in the September, 1996, and November, 1996, issues of *The DataLaw Report.*

accepts "as true for the purpose of determining the adequacy of the prima facie jurisdictional showing." *Id.* The approach is particularly appropriate when the facts which would support personal jurisdiction are not disputed. *See id.; Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 676 (1st Cir.1992).

At the other extreme lies the "preponderance-of-the-evidence standard," which "necessitates a full-blown evidentiary hearing at which the court will adjudicate the jurisdictional issue definitively before the case reaches trial." *Foster–Miller*, 46 F.3d at 145–46. The problem with this approach is that it "contemplates a binding adjudication . . . [with] preclusive effect . . . [which] can all too easily verge on a deprivation of the right to trial by jury." *Id.* at 146.

■ The First Circuit has offered this Court a "middle course" which I will follow: To engage "in some differential factfinding, limited to probable outcomes as opposed to definitive findings of fact . . ." in order to determine whether "the plaintiff has shown a likelihood of the existence of each fact necessary to support personal jurisdiction." *Id.* at 146 (quoting *Boit*, 967 F.2d at 677). Since the preliminary injunction motion presently before me also requires findings of fact based on a comparable standard, and since some facts supporting jurisdiction may be "bound up with the claim on the merits," *id.*, the intermediate test seems a particularly appropriate course. *See Boit*, 967 F.2d at 677–78; *Foster–Miller*, 46 F.3d at 146.

I find the following jurisdictional facts necessary and sufficient to support personal jurisdiction over ATI are likely to exist:[17] ATI entered into a contract with Digital that includes a clause requiring this contract to be interpreted "under and in accordance" with the laws of Massachusetts; this contract (the "AltaVista" license) and ATI's alleged breach of it gives rise to the present litigation; ATI operates a Web-site accessible to Massachusetts computer-users; it solicits advertising and its own products through the site; it made at least three sales to Massachusetts residents of software products in the course of and related to its operation of a Web-site;

finally, Digital alleges ATI's Web-site has infringed its trademark and caused considerable confusion in Massachusetts.

### D. *The Massachusetts Long–Arm Statute*

The Massachusetts Long–Arm statute, M.G.L. ch. 223A § 3 ("Section 3"), provides several bases for asserting jurisdiction.

Section 3 reads in pertinent part:

A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's (a) transacting any business in this commonwealth; . . . (c) causing tortious injury by an act or omission in this commonwealth; (d) causing tortious injury in this commonwealth by an act or omission outside this commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this commonwealth. . . .

M.G.L. ch. 223A § 3(a, c-d). Any one of these grounds would be sufficient. The facts which I have found could be construed to confer personal jurisdiction over ATI based on all three: (1) ATI's transacting business in the Commonwealth of Massachusetts; (2) ATI's Web-site allegedly causing tortious injury by acts or omissions in this Commonwealth; or (3) ATI allegedly causing tortious injury in this Commonwealth based on the act of maintaining a Web-site outside Massachusetts, while engaging in what I consider to be a persistent course of conduct here.

#### 1. *ATI's Transaction Of Business In Massachusetts*

■ Section 3(a) requires that the defendant must have transacted business in Massachusetts and that the plaintiff's claim must have arisen from the transaction of such business. *Tatro v. Manor Care, Inc.*, 416 Mass. 763, 767, 625 N.E.2d 549 (1994). At the outset, the Massachusetts Supreme Judicial Court, however, reminds us that Sec-

**17.** As these facts are determined preliminarily, they are to be considered neither issue preclu-

sive, nor the "law of the case." *Boit*, 967 F.2d at 677.

tion 3(a) "has been construed broadly." *Id.* (citation and internal quotation marks omitted). That court held that "[a]lthough an isolated (and minor) transaction with a Massachusetts resident may be insufficient [to satisfy Section 3(a) ], generally the purposeful and successful solicitation of business from residents of the Commonwealth, by a defendant or its agent, will suffice to satisfy this requirement." *Id.* (citations omitted). The "purposeful and successful solicitation of business" from Massachusetts residents may be manifested by a contract with such a resident. Where, as here, such a contract is "associated with other forum-related activities," the transacting business requirement of section 3(a) is met. *Id.* at 768, 625 N.E.2d 549 (citations omitted).

■ The license-agreement to use the trademark "AltaVista" is a contract entered into by ATI with Digital, a Massachusetts corporation. Without more, it may not be sufficient to comprise transacting business under section 3(a). The "more" is the following:

First, the contract at issue is an integral part of ATI's transaction of business in Massachusetts. ATI initially sold Digital all of its rights in "AltaVista"; it then contracted to "license-back" the use of "AltaVista" in its url. Any use of this Web-site in Massachusetts "arises from" the contract ATI executed with Digital. Second, ATI's contract with Digital, which governed the use of the Web-site with the address "www.altavista.com," was the vehicle through which it solicited

business from Massachusetts residents. Its Web-site solicited both sales of software and advertising. Finally, ATI admits that its solicitations were in fact successful; it has made at least three sales to Massachusetts residents.[18]

ATI claims that its contacts with Digital in Massachusetts are relatively minor. Digital apparently solicited the contract from ATI; the negotiations were conducted by phone or in California; the contract itself was not signed by ATI in Massachusetts; neither the defendant nor its physical agents have traveled to Massachusetts, nor does ATI maintain any presence here apart from its Web-site.

Nevertheless, those contacts, especially when viewed in the context of ATI's conduct *after* the contract with Digital was executed—the increasing similarities between the appearance of Altavista's Web site and Digital's, ATI's apparent belief that the licensing agreement gave it free rein to capitalize on Digital's Altavista's popularity in Massachusetts and elsewhere, the sales to Massachusetts residents—make it clear that its "contract with the plaintiff was one part of a broader range of activities that, literally, amounted to the transaction of business in Massachusetts." *Tatro,* 416 Mass. at 769, 625 N.E.2d 549.

ATI also minimizes its contacts by claiming that all it was doing was selling general advertising space on its Web-site, which only incidentally reached Massachusetts residents.[19] While general advertising may not

**18.** Ultimately, it does not matter for jurisdictional purposes whether these sales were made because a computer user clicked while accessing ATI's Web-site, or by calling a toll-free telephone number, or by answering mail. The reality is that a Web-site is accessible by people in Massachusetts, they have accessed ATI's Web-site, and ATI's actions resulted in purchases being made by Massachusetts citizens.

**19.** In *Droukas v. Divers Training Academy, Inc.,* 375 Mass. 149, 376 N.E.2d 548 (1978), a publication advertising marine engines was distributed in Massachusetts, resulting in a single sale to a Massachusetts resident of allegedly damaged engines. The Court noted that it "view[ed] the sale of the engines to the defendant [sic] as an isolated transaction, with slight effect on the commerce of the Commonwealth." *Id.* at 154, 376

N.E.2d 548. The addition of advertising which reached into the Commonwealth, although a "but for" cause of the sale, was not sufficient to change the equation.

*Droukas* stands for the proposition that when contacts are otherwise slight, general advertising alone will not suffice to confer jurisdiction, even if it leads to a single sale. *But see, A–Connoisseur Transportation Corp. v. Celebrity Coach, Inc.,* 742 F.Supp. 39, 42 (D.Mass.1990) (citing both *Gunner v. Elmwood Dodge, Inc.,* 24 Mass.App.Ct. 96, 99, 506 N.E.2d 175 (1987), and *Kleinerman v. Morse,* 26 Mass.App.Ct. 819, 822, 533 N.E.2d 221 (1989)). In *A–Connoisseur, Gunner,* and *Kleinerman,* the courts agreed that general advertising that happened to circulate in Massachusetts, in contrast to advertising aimed specifically at Massachusetts residents, was inadequate standing alone. Nevertheless, in all three cases, the Court

suffice to confer jurisdiction, in this case, ATI's selling of advertising space (and advertising its own products) on a Web-site *is* related to the very contract it signed with a Massachusetts company, and integral to the cause of action.[20] Here ATI's advertising (of its own products and services) on its Website in part creates the cause of action. Moreover, when juxtaposed next to its other contacts with this state, it suffices under 3(a).

In short, Digital's suit "arises from" an alleged breach of a contract with a Massachusetts corporation, and ATI's resulting Internet activities, including sales and advertising to Massachusetts residents taken together constitute transacting business here. The requirements of Section 3(a) have thus been satisfied.

### 2. ATI's Alleged Tort Caused By Acts In Massachusetts

Misrepresentations made "in" Massachusetts can be an alternative basis for jurisdiction under Section 3(c). *See, e.g., Ealing Corp. v. Harrods, Ltd.*, 790 F.2d 978, 982 (1st Cir.1986) (holding that a misrepresentation in a telex sent to Massachusetts would provide

the basis for Section 3(c) jurisdiction, citing First Circuit and Massachusetts cases). More recently, the Massachusetts Appeals Court held that intentional misrepresentations made by an attorney by phone and mail were sufficient to provide jurisdiction under Section 3(c). *See Rye v. Atlas Hotels, Inc.*, 30 Mass.App.Ct. 904, 906, 566 N.E.2d 617 (1991) (quoting *Murphy v. Erwin–Wasey, Inc.*, 460 F.2d 661, 663–64 (1st Cir.1972)). *See also Burtner v. Burnham*, 13 Mass.App. Ct. 158, 163, 430 N.E.2d 1233 (1982) ("[w]here a defendant knowingly sends into a state a false statement, intending that it should be relied upon to the injury of a resident of that state, he has, for jurisdictional purposes, acted within that state.")[21]

■ Using the Internet under the circumstances of this case is as much knowingly "sending" into Massachusetts the allegedly infringing and therefore tortious uses of Digital's trademark as is a telex, mail, or telephonic transmission;[22] the only difference is that the transmission is not "singularly" directed at Massachusetts, in the way that a

---

found that the requirements of Section 3(a) were *otherwise* met through other contacts between the parties.

*Tatro* suggests jurisdiction where the contacts, including the advertising, are different both in degree and in kind—when there is persistent advertising and solicitation of business from Massachusetts residents, even if it involves only a single sale, or when the cause of action arises from the advertising itself. In *Tatro* the defendant solicited conference business from all over the country, resulting in the holding of one conference at the defendant's hotel. Thereafter, the hotel made contact with the Massachusetts parties to inquire about holding its conference at the defendant's hotel the following year, together with a proposal setting the terms of the conference. The plaintiff was injured during her stay at the hotel and sought to sue the defendant in Massachusetts. *See Tatro*, 416 Mass. at 771–72, 625 N.E.2d 549. Moreover, under *Tatro*, advertising may permit the assertion of jurisdiction where the cause of action arises from the advertising itself. *See id.*

The Massachusetts contacts in the instant case are more like those in *Tatro* than those in *Droukas:* more contacts, more sales, and a cause of action arising from the advertising—the Web page—itself.

**20.** Numerous courts have held that jurisdiction can be based on the broadcasting of a television program (or advertising) into the forum state

when the cause of action arises, as it does here, from the broadcast itself (insofar as broadcast is analogous to the maintenance of a Web-site accessible in a given state). *See, e.g., Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club Ltd. Partnership*, 34 F.3d 410, 412 (7th Cir.1994) (holding television broadcast into Indiana supports personal jurisdiction over defendant there); *Holmes v. TV–3*, 141 F.R.D. 692, 696 (W.D.La.1991) (same); *Viacom Int'l, Inc. v. Three Star Telecast, Inc.*, 639 F.Supp. 1277, 1280 (D.P.R.1986) (same); *Thomas Jackson Publishing, Inc. v. Buckner*, 625 F.Supp. 1044, 1046 (D.Neb.1985) (same); *Tonka Corp. v. TMS Entertainment, Inc.*, 638 F.Supp. 386, 390–91 (D.Minn.1985) (same); *United Medical Laboratories, Inc. v. CBS, Inc.*, 256 F.Supp. 570, 572 (D.Or.1966) (holding Walter Cronkite, producer of a television news program, subject to personal jurisdiction based on the broadcast of the program into Oregon).

**21.** While *Rye* sustained the deceit and fraud claim, it also held that advertising which gives rise to a cause of action *cannot* be considered the transacting of business. The latter holding was expressly disapproved of in *Tatro*, 416 Mass. at 772 n. 5, 625 N.E.2d 549.

**22.** Trademark infringement is a tort which involves misrepresentation. *See Keds Corp.*, 888 F.2d at 218.

letter addressed to this state, or a telephone or fax number with a Massachusetts area code would be. But ATI "knows" that its Web-site reaches residents of Massachusetts who choose to access it, just as surely as it "knows" any letter or telephone call is likely to reach its destination. And it presumably "knows" the contents of its Web-site. ATI is a corporation whose primary business is providing Internet software; it is charged with the knowledge that its Web-site is accessible through the Internet in Massachusetts. It not only took no steps to prevent the alleged infringements from reaching this state's residents—assuming there were steps to take—it plainly intended to market its wares here.

Again, this lawsuit "arises from" ATI's allegedly tortious acts or omissions, and Section 3(c)'s requirements are thus satisfied.

### 3. *Alleged Tort Caused By Acts Outside Massachusetts*

Section 3(d) requires a tort committed in Massachusetts based on acts committed elsewhere, coupled with either regular solicitation of business, or continuing contacts, or the derivation of substantial revenue from Massachusetts.[23]

As noted above, Digital alleges that a tort—trademark infringement—was committed in Massachusetts. The question under Section 3(d) is whether ATI's activities also amount to regularly "solicit[ing] business" in this Commonwealth or constitutes "en-

gag[ing] in any other persistent course of conduct" within the meaning of the Section.

▮ ATI's Web-site, generally accessible twenty-four hours a day and seven days a week to all Massachusetts residents who can access the Web, plainly solicits business in Massachusetts. It also constitutes continuing contacts with this state insofar as ATI sells advertising space and software through the Web site to citizens of Massachusetts. When software is sold (or even given away so that users will visit the site) through the Web-site, the software can be transmitted via the Internet directly to a computer located in Massachusetts; as such, it plainly comprises doing business here. At least three such sales have taken place. ATI further "solicits" business by offering advertising space to Massachusetts citizens for a fee.

Maintaining a Web-site that can be accessed by Massachusetts citizens, coupled with the other contacts described above, is engaging in a persistent course of conduct sufficient to satisfy the requirements of Section 3(d). *See Keds Corp. v. Renee Int'l Trading Corp.*, 888 F.2d 215, 218–19 (1st Cir.1989);[24] *Landmark Bank v. Machera*, 736 F.Supp. 375, 384 (D.Mass.1990). Digital's cause of action arises from ATI's continuing course of conduct on a Web-site that allegedly causes torts inside Massachusetts.

---

**23.** Section 3(d) has been said to reflect the theory of "general" jurisdiction, even though Section 3's over-arching "arising from" language, applicable to each sub-section, clearly "adopts the theory of 'specific' personal jurisdiction...." *See Landmark Bank v. Machera*, 736 F.Supp. 375, 383–84 (D.Mass.1990); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 & n. 15, 105 S.Ct. 2174, 2181–83 & n .15, 85 L.Ed.2d 528 (1985) (" 'Specific' jurisdiction contrasts with 'general' jurisdiction, pursuant to which 'a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum.' " (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 1872 n. 9, 80 L.Ed.2d 404 (1984), other citation omitted)). Section 3(d) embraces specific jurisdiction as well, and does so in this case.

**24.** *Keds Corp.* states that deriving "substantial revenue" from the commonwealth is one of the "requirements" of Section 3(d). *See Keds Corp.*

*v. Renee Int'l Trading Corp.*, 888 F.2d 215, 218–19 (1st Cir.1989) (inserting the word "and" into Section 3(d) before "derive substantial revenue" and holding this to be "[t]he second of the two requirements of the statute"). The First Circuit appears to have read Section 3(d) as conjunctive in holding that "substantial revenue" was "the"—as opposed to "a"—second requirement of Section 3(d). In fact, the statute is disjunctive, and satisfied by the causation of a tortious injury in the commonwealth coupled with any one of a number of second "requirements," including engaging in "any other persistent course of conduct" even if the foreign defendant does not derive substantial revenue from the state. *See Welsh v. Derwinski*, 14 F.3d 85, 86–87 (1st Cir. 1994); *see also Cleary v. Knapp Shoes, Inc.*, 924 F.Supp. 309, 317 (D.Mass.1996) (noting *Welsh* stands for the proposition that "inadvertent language in prior opinion is not binding").

In the present case, therefore, I do not reach the issue of whether ATI has derived "substantial revenue" from Massachusetts.

### E. Constitutional Due Process Concerns

In order to establish personal jurisdiction over a non-resident defendant in a way consistent with due process, the defendant must either have 1) "substantial, continuous and systematic" presence in the forum state which would give the court general jurisdiction over the defendant or 2) certain "minimum contacts" with the forum state such that maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *See International Shoe Co. v. Washington,* 326 U.S. 310, 314, 66 S.Ct. 154, 157, 90 L.Ed. 95 (1945). The former confers general jurisdiction: the latter, specific. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–73 & n. 15, 105 S.Ct. 2174, 2181–83 & n. 15, 85 L.Ed.2d 528 (1985) (citations omitted). Plainly, this case involves specific jurisdiction, framed by the "minimum contacts" test.

In order to find "minimum contacts," a non-resident defendant must meet the following requirements:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the gestalt factors, be reasonable.

*United Electrical, Radio and Machine Workers of America v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1089 (1st Cir.1992). These three tests have been called relatedness, purposeful availment, and reasonableness. *See Burger King,* 471 U.S. at 472–78, 105 S.Ct. at 2181–85.

### 1. Relatedness

■ As an initial matter, "[w]e know ... that the [relatedness] requirement focuses on the nexus between the defendant's contacts and the plaintiff's cause of action." *Ticketmaster–New York, Inc. v. Alioto,* 26 F.3d 201, 206 (1st Cir.1994). As the First Circuit noted in *Nowak v. Tak How Investments, Ltd.,* 94 F.3d 708, 712 (1st Cir.), *reh'g denied en banc* (1996), the requirement serves two purposes: First, relatedness is the "divining rod that separates specific jurisdiction cases from general jurisdiction cases." *Id.* Second, it ensures that "the element of causation remains in the forefront of the due process investigation." *Id.*

It cannot be disputed that the underlying claims in this litigation arise directly from and relate to ATI's forum-state activities, both in the form of its contract with Digital, and in its subsequent maintenance of a Website which allegedly breached that contract and caused torts in Massachusetts.[25]

### 2. Purposeful Availment

Unlike the "relatedness" test, the purposeful availment test focuses on the deliberateness of the defendant's contacts. *Ticketmaster,* 26 F.3d at 207. The contacts with the forum state must be voluntary—not based on the unilateral actions of another party or a third person. *Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183–84. And they must be foreseeable; the defendant's contacts must be such that he should reasonably be able to anticipate "being haled into court" in the forum state. *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

ATI argues that it should not be subject to jurisdiction here because rather than "purposefully availing" itself of the Massachusetts forum, it did everything in its power to structure its affairs to avoid this forum. The contract was solicited by Digital; negotiations were conducted by phone or in California; the contract was not signed in

---

**25.** In *Nowak,* the Court dealt at length with the question of how "causation" is defined in connection with the "relatedness" prong, whether it was "but for" test, recently suggested by the Massachusetts Supreme Judicial Court in *Tatro,* or a more rigorous, "proximate cause" analysis, which had been the First Circuit's standard. The result was mixed, what the Court described as a "small overlay" of "but for" on "proximate cause." *Id.* at 715. However causation is defined under this test, it is clear that the instant facts meet it.

Massachusetts; while it indicated that Massachusetts law would be the choice of law, it expressly included no forum selection clause. To the extent that ATI crossed Massachusetts boundaries at all, it argues, it was because Massachusetts users chose to dial in.

True enough. ATI may well have done everything possible to avoid jurisdiction in terms of its contract and non-Web contacts with Massachusetts. ATI's Web-site, its design, the extent to which it infringed Digital's trademark, and breached the contract, however, necessarily changes the equation: *This* Web-site, in context, creates minimum contacts.

Where the minimum contacts on which jurisdiction is allegedly based are unrelated to the acts comprising the cause of action, the courts have applied a strict test to determine whether the defendant's transactions suffice to amount to "purposeful availment." In *Hanson v. Denckla*, 357 U.S. 235, 251, 253, 78 S.Ct. 1228, 1238–39, 2 L.Ed.2d 1283 (1958), for example, where the cause of action did not arise from the defendant's contacts with the forum state, the Court noted that "it is essential ... that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."

Where the case involves torts that create causes of action in a forum state (even torts caused by acts done elsewhere), however, the threshold of purposeful availment is lower. The defendant allegedly causing harm in a state may understandably have sought no privileges there; instead the defendant's purpose may be said to be the targeting of the forum state and its residents. In *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984), for example, the Supreme Court found that those responsible for an article published by the National Enquirer about the actress Shirley Jones, where the reporters knew that Jones lived and worked in California, and that she would bear the brunt of the injury in California, should "anticipate being haled into court there to answer for the truth of their statements." 465 U.S. at 789–90, 104 S.Ct. at 1487. ("Petitioners are primary participants in an alleged wrongdoing intentionally directed at a California resident, and jurisdiction over them is proper on that basis"); *Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir.1989) (holding the same, citing *Calder*).[26]

The First Circuit addressed what it called the "classic analogy for an out of state libel: the gunman firing across a state line." *Ticketmaster*, 26 F.3d at 208.[27] In that case, as in the case before me, it was the action of a resident of Massachusetts (a reporter calling a source in California who allegedly made libelous statements which were then printed in the Boston Globe here) that arguably formed the basis of the assertion of jurisdiction over the foreign defendant.[28] *See id.* at 208–12. Therefore that court held the defendant's action of answering the phone and making an allegedly libelous comment during an interview initiated by the Massachusetts reporter constituted purposeful availment, although only by a "bare minimum." *Id.* at 212.[29]

Similarly, in *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781, 104 S.Ct. 1473, 1482, 79 L.Ed.2d 790 (1984), the Court held: "Respondent produces a national publication aimed at a nationwide audience. There is no unfairness in calling it to answer for the

**26.** In yet another context, the Court has noted that "under modern principles of ... in personam jurisdiction state courts have jurisdiction over acts committed beyond their territorial boundaries that create a nuisance in their state." *Ohio v. Wyandotte Chemicals Corp.*, 401 U.S. 493, 500, 91 S.Ct. 1005, 1010–11, 28 L.Ed.2d 256 (1971).

**27.** The better analogy in this case is that of a defendant repeatedly firing a shotgun into a crowd across the state line, not aiming at anyone in particular, but knowing nonetheless that harm in the forum state may be caused by its actions outside it.

**28.** As in *Ticketmaster*, a Massachusetts resident in the instant case did something pro-active to get access to the suspect material; in order to access ATI's Web-site, users must "call it up" or take some similar action.

**29.** In reviewing the "gestalt" factors, however, the Court concluded that considerations of fair play and substantial justice cut against the exercise of personal jurisdiction in Massachusetts.

contents of that publication wherever a substantial number of copies are regularly sold and distributed." Web-sites are modern analogs of national publications; potentially innumerable "copies" can be (and are) regularly "distributed" wherever there is access to the World–Wide Web.

Trademark infringement is similar to libel. *Burger King,* 471 U.S. at 469–70 n. 11, 105 S.Ct. at 2180 n. 11. Indeed, a similar question to the one before me, namely the extent to which trademark infringement *outside* a state may provide the basis for jurisdiction, has been explicitly left open by the Supreme Court. *Id.* ("[W]e need not address the extent to which the tortious act provisions of Florida's long arm statute ... may constitutionally extend to out-of-state trademark infringement" (citing *Calder,* 465 U.S. at 788–89, 104 S.Ct. at 1486–87; *Keeton,* 465 U.S. at 776, 104 S.Ct. at 1479.)).[30] In an analogous case, *Thomas Jackson Publishing, Inc. v. Buckner,* 625 F.Supp. 1044 (D.Neb.1985), the Court applied Calder's "effects" test to sustain jurisdiction when it found that the defendant's alleged infringement of plaintiff's copyrighted song was conduct "purposefully directed" at the plaintiff.

Here, when ATI posted a Web-site which over time more and more mirrored the site of a Massachusetts corporation, arguably in violation of Digital's trademark rights and the licensing agreement, a site that plainly would attract Massachusetts residents, and did so, it, like the petitioners in *Calder,* should have anticipated being haled into a Massachusetts court to answer for its acts. Every day, potentially thousands of Massachusetts residents visit ATI's Web-site; and each "call" is "answered" by the display of allegedly tortious materials that cause harm here, there, and everywhere (but especially here). Since ATI knows that Digital is located here, the purposeful availment prong is met: ATI's

conduct, by allegedly causing trademark infringement that it knows will have an effect on consumers in this state, and an especially harmful effect on Digital, whose trademark rights are at issue, *see Panavision Int'l, L.P. v. Toeppen,* 938 F.Supp. 616, 621–22 (C.D.Cal.1996), satisfies the constitutional "purposeful availment" due process tests.

### 3. *"Reasonableness" Test (Featuring Gestalt Factors)*

Satisfying the purposeful availment tests does not end the due process inquiry. Jurisdiction must still comport with "traditional notions of 'fair play and substantial justice.'" *Nowak,* 94 F.3d at 717 (citing *International Shoe,* 326 U.S. at 320, 66 S.Ct. at 160 (which quoted *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 343, 85 L.Ed. 278 (1940))). The First Circuit enumerated the following five "gestalt factors" to be used to determine the fairness and reasonableness of asserting personal jurisdiction:

(1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

*Id.* (citing *163 Pleasant St. Corp.,* 960 F.2d at 1088 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184–85)). While "the gestalt factors may tip the constitutional balance," *id.,* in this case they serve to buttress the constitutionality of this Court's assertion of jurisdiction. Moreover, "a strong showing of reasonableness may serve to fortify a more marginal showing of relatedness and purposefulness." *Id.* (citing *Ticketmaster,* 26 F.3d at 210 (citing *Donatelli v. National*

---

**30.** Presumably, the *Burger King* Court was touching upon an issue that is even more prevalent in this case: in *Calder,* the Court found jurisdiction because the harm hurt the plaintiff most where he lived; thus being haled into California, where the defendants knew the subject of their allegedly libelous story resided, was held constitutional. *Calder,* 465 U.S. at 785–90, 104 S.Ct. at 1484–88. In the case at bar, the alleged harm would not only effect Digital, but also consumers who

might be confused by allegedly infringing uses of "AltaVista." Such was the Court's holding in *Keeton v. Hustler Magazine Inc.,* 465 U.S. 770, 776, 104 S.Ct. 1473, 1479, 79 L.Ed.2d 790 (1984) ("[f]alse statements of fact harm both the subject of the falsehood and the readers of the statement"). Thus the case before me is a poignant combination of *Calder's* "hits hardest at home" and *Keeton's* "hits hard everywhere" "effects" tests.

*Hockey League,* 893 F.2d 459, 465 (1st Cir. 1990))).

### a. The "Onerous" Burden Of Appearance

While ATI does have to cross the continent to appear in this Court, and this is somewhat "onerous," *Ticketmaster,* 26 F.3d at 210, that may well be the price of its agreeing to do business involving the Internet under the circumstances of this case; if one does something that could cause a tort in another state, then this inconvenience should be considered by potential foreign defendants before they act. The First Circuit recently indicated "this factor is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker v. Yari,* 42 F.3d 53, 64 (1st Cir.1994). This burden was not found simply in the need to travel from New York to Puerto Rico, where the forum state in that case was. *Id.* The distance by plane between California and Boston can scarcely be more onerous than that between Puerto Rico and New York. Also, there is no evidence that Digital chose this forum to "harass" or "vex" ATI. *See Ticketmaster,* 26 F.3d at 211. This factor neither supports nor undermines the reasonableness of this Court's jurisdiction.

### b. Massachusetts's Interest In This Lawsuit

Clearly this factor heavily favors the assertion of jurisdiction. Trademark infringement allegedly occurs here, and "a forum state has a significant interest in obtaining jurisdiction over a defendant who causes tortious injury within its borders." *Nowak,* 94 F.3d at 718 (citing *Ticketmaster,* 26 F.3d at 211); *see Keeton,* 465 U.S. at 776, 104 S.Ct. at 1479 (holding that "it is beyond dispute that New Hampshire has a significant interest in redressing injuries that actually occur within the State"). Digital is one of the largest corporations in Massachusetts, and it is the one that suffers the most from the alleged tort of its trademark rights in AltaVista being infringed.

### c. The Convenience Of This Particular Venue

This Court will "accord deference to" Digital's "choice of a Massachusetts forum," a forum that is more convenient for it than any other. *Nowak,* 94 F.3d at 718. Its primary counsel is situated here, as are its executives who negotiated the license agreement that ATI allegedly breached. This factor too, weighs heavily in favor of jurisdiction.

### d. The Administration Of Justice

"Usually this factor is a wash." *Id.* So too here. The only aspect of this factor that cuts in favor of the assertion of jurisdiction is that the trademark license agreement that gives rise to this litigation contains a provision which states, in "General Provisions" § 10.3, that this "Agreement is made and shall be construed and interpreted under and in accordance with the laws of the Commonwealth of Massachusetts (but not including the choice of law rules thereof)." While I have no doubt that other federal district courts could construe this agreement in accordance with Massachusetts law effectively, this Court does, of necessity, have somewhat more experience in the area. Thus, to the extent that this factor weighs in at all, it, too, supports jurisdiction here.

### e. Some Pertinent Policy Arguments

The policy questions are somewhat more complicated. On the one hand, it is troubles me to force corporations that do business over the Internet, precisely because it *is* cost-effective, to now factor in the potential costs of defending against litigation in each and every state; anticipating these costs could make the maintenance of a Web-based business more expensive. On the other hand, it is also troublesome to allow those who conduct business on the Web to insulate themselves against jurisdiction in every state, except in the state (if any) where they are physically located.

Massachusetts has an interest in protecting its citizens from confusion, and its corporations from trademark infringement. It has a further interest in alerting its citizens who maintain Web-sites for business purposes that there is a chance that they may be haled into court in any state where their Web-site potentially causes harm or transacts business. On the whole, this factor leans toward this Court's assertion of jurisdiction over ATI.

### F. Other Internet Personal Jurisdiction Cases

Digital has met its burden of adducing facts likely to support this Court's proper assertion of jurisdiction over ATI. Four other district courts, faced with various versions of this issue, have reached the same conclusion: In certain situations, maintenance of a Web-site can subject one to personal jurisdiction in foreign courts. *See Panavision,* 938 F.Supp. at 622–23; *Inset Systems, Inc. v. Instruction Set, Inc.,* 937 F.Supp. 161, 163–65 (D.Conn.1996); *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328, 1334 (E.D.Mo.1996); *EDIAS Software Int'l v. BASIS Int'l Ltd.,* 947 F.Supp. 413, 419–20 (D.Ariz.1996). A case that reached a different conclusion, *Bensusan Restaurant Corp. v. King,* 937 F.Supp. 295, 299 (S.D.N.Y.1996), did so because it found that the allegedly infringing activity of the Web-site at issue (maintained by a local club in Missouri, and targeting only that local area) neither caused confusion in New York, nor was aimed at New York residents. In effect, in *Bensusan,* the Web-site functioned like a local paper; it was not intended to reach a national audience, and had no effect on New York citizens. *Id.*

ATI, in contrast, targets a national audience. It may not have made many sales or transacted much business in Massachusetts, but it has made at least three sales to residents here involving its Web-site. ATI does and seeks business in Massachusetts. And in the context of trademark infringement, it has long been the law that harm is caused by the very *offer* of an infringing work, even if not one single sale is made. *See Editorial Musical Latino Americana v. Mar Int'l Records, Inc.,* 829 F.Supp. 62, 64–65 (S.D.N.Y. 1993) (collecting cases).

Taking into account all the relevant facts which are likely to exist, this Court's assertion of jurisdiction over ATI is proper. ATI's motion to dismiss pursuant to Fed. R.Civ.P. 12(b)(2) is therefore **DENIED.**

## IV. PRELIMINARY INJUNCTION

### A. Preliminary Injunction Standard

The granting of a preliminary injunction in actions for trademark infringement under § 43(a) of the Lanham Act requires a showing that: (1) the plaintiff may suffer irreparable injury absent an injunction; (2) equitable balancing weighs in favor of plaintiff when measuring the harm the injunction would do to defendants; (3) plaintiff is likely to succeed on the merits; and (4) public interest favors granting the preliminary injunction. *See, e.g., Camel Hair and Cashmere Institute of America, Inc. v. Associated Dry Goods Corp.,* 799 F.2d 6, 12 (1st Cir. 1986).

In the context of trademark infringement, if Digital can show it is likely to prevail on the merits of its infringement claims (and hence has shown it is likely to prevail on the breach of license claim), two consequences follow. First, there is a presumption that plaintiff will suffer irreparable injury absent an injunction. *See id.* at 14–15. Second, the preliminary injunction will be held to be beneficial, and in the public interest, "given the societal value of full disclosure and fair competition, together with the policy of the law to provide at least minimal protection to established trade names...." *Hypertherm, Inc. v. Precision Products, Inc.,* 832 F.2d 697, 700 (1st Cir.1987); *see also Calamari Fisheries, Inc. v. The Village Catch, Inc.,* 698 F.Supp. 994, 1015 (D.Mass.1988) ("Preventing consumer confusion is clearly in the public interest.").

Thus, in the trademark context, the "heart of this test [for preliminary injunctions] is the second and third steps, which present the question whether the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants." *Calamari Fisheries,* 698 F.Supp. at 1005 (noting that this test applies "particularly in actions arising out of the Lanham Act").

For purposes of this motion, the Court accepts that if the plaintiff can make an adequate showing of likelihood of success on the merits for *both* its breach of license *and* trademark infringement claims, it has suffered and may continue to suffer irreparable harm absent an injunction; further, an injunction would be in the public interest, to prevent consumer confusion.

## B. *Breach Of The Trademark License*

■ The first question is whether Digital has demonstrated that it is likely to prevail on its claim that ATI has breached the licensing agreement concerning "AltaVista." Any "sales of goods or services under the mark which are outside the area of consent granted in the license are regarded as infringements of the mark." *McCarthy on Trademarks and Unfair Competition,* § 25.06, at p. 44 (3d ed.1996) (hereinafter "*McCarthy* ").[31]

### 1. *Terms Of The "AltaVista" License Agreement*

On March 19, 1996, Digital entered into an assignment and license-back arrangement with ATI, whereby ATI assigned "all right, title and interest in and to said trademark" in exchange for valid consideration; on that same day Digital granted a license to ATI to use the "AltaVista" mark in two clearly specified ways: as part of ATI's corporate name, "Altavista Technologies, Inc.," and as the domain name of its Web-site "www.altavista.com." The license states ATI shall have the right to use the mark in these two ways "*and* in accordance with and subject to the terms and conditions of this agreement." The parties dispute the meaning and import of this "and in accordance" clause of the AltaVista "License Grant."

ATI argues that the "and in accordance" language allows for a third category of permitted uses of "AltaVista" in addition to the two specified uses. Digital disagrees; it contends the "and" clause is not permissive, but rather a limitation on the two specified uses. I agree. ATI can use "AltaVista" only in the two specified ways, and then only so long as these uses are in accordance with and subject to the terms and conditions of the license agreement.

The license agreement directs that it "is made and shall be construed and interpreted under and in accordance with the laws of the Commonwealth of Massachusetts (but not including the choice of law rules thereof)." Neither side contests this choice of law; nor do I find any basis for doing so.

The Supreme Judicial Court recently reiterated some of its rules of contract construction:

> We have said that a contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties. Similarly, the Restatement expounds that an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect.

*Starr v. Fordham,* 420 Mass. 178, 192, 648 N.E.2d 1261 (1995) (internal quotation marks and citations omitted).

■ The License Grant, section 1.1, expressly authorizes only two uses. Under the prevailing maxim of Massachusetts' contract law, *expressio unius est exclusio alterius,* an express grant of permitted uses precludes other uses. *See FDIC v. Singh,* 977 F.2d 18, 22 (1st Cir.1992); *Chatham Pharmaceuticals, Inc. v. Angier Chemical Co.,* 347 Mass. 208, 211, 196 N.E.2d 852 (1964). Section 1.1 of the License says:

> Digital hereby grants to ATI a nonexclusive, nontransferable license to use the trademark "AltaVista" (the "Mark") as part of the corporate name "Altavista Technologies, Inc." and as part of the url "http:// www.altavista.com," and in accor-

---

**31.** It is axiomatic that a valid, licensed use of another's mark would not constitute trademark infringement. *See McCarthy*, § 18.14, at pp. 64–65. The corollary, that a non-licensed use could automatically constitute trademark infringement, is suggested by Professor McCarthy in the context of licensees not protecting the quality of the products or services sold under the mark. *See id.* § 25.06, at pp. 44–45 (collecting cases). Digital alleges that the quality of ATI's Web-site, as well as its style and appearance, fail to protect the "AltaVista" mark and the goodwill associated therewith. Accordingly, it contends that the services and products being offered for sale by ATI are non-authorized.

If the license has been breached, it is obviously not a valid defense against a claim of trademark infringement. I turn next to the question of whether ATI's unauthorized uses of "AltaVista" are likely to constitute infringements of Digital's mark.

dance with and subject to the terms and conditions of this Agreement.... [32]

There is no comma between the two specified uses (the corporate name and the url); there is, however, a comma *after* the enumeration of these two expressly licensed uses.

The interpretation that gives effective and reasonable meaning to this clause is that ATI can use the "AltaVista" mark in two and only two contexts: as part of its corporate name, and as part of its Web-site's domain name. *Any* other use is likely to be a breach. The license adds, in the "and" clause, that ATI must only use "AltaVista" in accordance with and subject to the terms and conditions of the license agreement, *including* the express two-use limitation.[33]

But while the agreement expressly authorizes only two uses for the mark "AltaVista," ATI argues that the agreement does not bar it from using the mark alongside some other name or identifier. ATI claims it has the right to continue to market "AltaVista Howdy" software, for example. The sentence "[t]his License does not grant ATI the right to use the Mark as the name of a product or service offering," according to ATI, raises the question of whether "*the* name" means that ATI cannot use "AltaVista" as the *sole* name of a product or service offering, but that it can couple "AltaVista" with some other name.

Digital argues that the clause means ATI cannot use "AltaVista" as the name of product or service offerings at all, even as an "umbrella" or housemark.[34] Digital goes so far as to argue that ATI cannot market products or services with "AltaVista Technology, Inc." as part of a product or service name where "AltaVista" is effectively used as a mark: namely, where the use of the "AltaVista" mark overshadows the word "Technology." For the following reasons, I agree.

Nothing written in the license agreement expressly precludes ATI from using "AltaVista" in conjunction with "Technology, Inc.," its full corporate name, as part of a product or service name. The last sentence of section 1.1, states that the license "does not grant ATI the right to use *the Mark* as the name of a product or service offering" (emphasis added); alongside that is the fact that the agreement does allow ATI to use it in its *full* corporate name.[35]

Nevertheless, trademark law concerning corporate or trade names supports Digital's proffered construction of the license agreement on this point.[36] The rule is that a " 'Trade name' as defined by federal law *cannot* be registered under the Lanham Act." *McCarthy*, § 9.13, at pp. 24–25 & nn. 2–6 (citing cases). The "reasoning behind the rule ... is that a trade name is usually adopted for the purpose of identifying the *company* and distinguishing it from other

---

**32.** There appears to be a missing close-quotation mark, which presumably should be placed after ATI's url (immediately after ".com,").

**33.** The word "and," as used in this context in the license agreement, is extraneous; the clause could as easily (and more clearly) have been drafted to grant ATI a license to use AltaVista in the two specified ways "[] in accordance with and subject to the terms and conditions of this Agreement."

**34.** A "house mark" is a mark that appears in conjunction with different "product marks" or "service marks" emanating from a single "house" or company. *McCarthy*, § 7.01[1][d], at p. 7.

**35.** To be sure, if Digital did not intend for these clauses to broadly preclude ATI from offering products or services with ATI's full corporate name as part of the name of these product or services, there would have been no need for a

clause expressly clarifying ATI's right to use the mark to identify itself.

**36.** I consider the concepts of "corporate" and "trade" names to be identical. *See McCarthy*, § 9:13–16, pp. 24–31. Professor McCarthy notes:

> If a corporate name is used in full with its address on letterheads and advertising, it is probably not being used in a servicemark sense. Similarly, the inclusion of a corporate designator, such as "Inc." or "Corp." is a factor strongly pointing to a solely trade name use, especially when the name appears in close proximity to a corporate address.

*Id.* at § 9:15, p. 28. In the present case, the express uses of "AltaVista" which the license allows ATI are in its address on the Web and as part of its corporate name; this buttresses the conclusion that ATI may not use the mark (even imbedded within the corporate name) as a trade or servicemark.

producers, rather than the trademark purpose of identifying goods, and distinguishing them from those produced by other producers." *Id.* § 9:13, at p. 24. Likewise the gist of the license agreement is that ATI may use "AltaVista" as part of its corporate or "trade" name ("Altavista Technology, Inc.") to distinguish the company, but may not use it as an *identifying* mark for a product or service.

Moreover, this reading is supported by the rest of the license: Section 2.2 notes that "ATI agrees that any and all use of the Mark shall inure to the benefit of Digital." In section 2.3, ATI "acknowledges that this agreement does not grant to it the right to adopt or use any name or mark confusingly similar to the Mark without the written consent of Digital, other than as provided herein." And in section 3.1, entitled "Quality Control," ATI is obliged to "use its best efforts to ensure that all products sold and services rendered while using the Mark shall be of a high standard and of such style, appearance and quality as to protect and enhance the Mark and the goodwill associated therewith." [37]

These sections, taken together, strongly suggest that ATI cannot directly profit from its use of "AltaVista," nor adopt any mark confusingly similar to "AltaVista," nor use "AltaVista" in any "style" or "appearance" that would detract from or cause confusion concerning Digital's "AltaVista" mark. Thus, ATI cannot use "AltaVista" as a mark at all, although it can continue to use "Alta-Vista" in its full corporate name and Web address.

### 2. ATI's Breach(es) Of The Licensing Agreement

As of May 22, 1996, on its Web-site ATI used "AltaVista" three times: None of these uses was as part of its corporate name. One use was at the top of the page, in the ATI "AltaVista" logo; a second use was the offer of free demo versions of "AltaVista software"; and below that the third use was a smaller "AltaVista" logo standing alone. All three of these uses likely breached the licensing agreement, as "AltaVista" was used apart from ATI's full corporate name, and as both a trade and service mark. Similarly, on August 8, 1996, there were three uses of "Alta-Vista" on the ATI Web-site, each of which likely constituted a breach. On September 5, 1996, ATI's Web-site still had three likely breaches, for even though it now included the word "Technology" after "AltaVista" twice, it did not do so as part of the corporate name "AltaVista Technology, Inc." The word "Alta-Vista" itself was in large, bold type, suggesting it was functioning as a trade or service mark, since it conveyed a commercial, source-identifying impression.[38] The same apparent breaches were in evidence on ATI's Web-site on October 28, 1996.

By November 15, 1996, there was some indication that ATI was attempting to cure these breaches: As of this date, ATI's Web-site used "AltaVista" only as part of its full corporate name; "AltaVista" itself, however, was presented to the user in such large, bold, distinctive letters that "AltaVista" may still have served to function as a trade or service mark, in breach of the license agreement.[39]

---

**37.** ATI argues that this language allows them to sell products and services "using the mark" *as* a mark. That is one interpretation; another equally plausible interpretation of this language is that any products or service which ATI sells while using the mark as its corporate name or on its Web-site must be of a certain quality level, otherwise Digital, as trademark holder, would risk abandonment of the mark due to lack of adequate quality control thereof. *See Franchised Stores of New York,* 394 F.2d at 668–69, 15 U.S.C. §§ 1055, 1064, 1127. Thus quality control is an affirmative duty placed on trademark owners, *see id.,* and such language is therefore *pro forma* in trademark licensing agreements. McCarthy, § 18.16[1–4].

**38.** It was presented "in a distinctively bolder, larger and different type of lettering ... [that] thus does more than merely convey information about a corporate relationship." *See In re Univar Corp.,* 20 USPQ.2d 1865, 1869 (TTAB 1991).

**39.** The record does not reflect whether these changes were made by November 6, 1996, the date upon which Digital has claimed it could exercise its right to terminate the license agreement.

I do not now hold that these breaches were direct violations of section 3.1 concerning "Quality Control," the only kind of violations for which the license expressly allows Digital to terminate upon ninety days notice. Digital sent a Notice of Termination to ATI's president, Jack Marshall, on August 8, 1996.

**476**

### C. *Trademark Infringement And Unfair Competition*

Since it likely breached its license, ATI cannot use that license as a defense to an action for trademark infringement. *See Birthright v. Birthright, Inc.*, 827 F.Supp. 1114, 1134 (D.N.J.1993) ("where defendants' previous use of the mark occurred with plaintiff's permission, plaintiff must also establish that a defendant's use of the mark is unauthorized"); *cf. S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 375 (3d Cir.1992) ("To prevail on an infringement claim ... Jiffy Lube must demonstrate as well that Durst's use of the marks was unauthorized."); *Costello Publishing Co. v. Rotelle*, 670 F.2d 1035, 1041 (D.C.Cir.1981) ("if any breach constituted a failure to satisfy a condition to the copyright license, an infringement of copyright as well as a breach of contract may have resulted"). Having concluded its use of "AltaVista" may well be unauthorized, I now analyze ATI's use of the "AltaVista" mark to determine whether it constituted trademark infringement and unfair competition.[40]

The relevant portion of the Lanham Act, 15 U.S.C. § 1125(a), involves false representations:

> Under this section, plaintiff is required to prove the following three elements to succeed in an infringement suit: (1) the ownership of a distinctive mark entitled to trademark protection; (2) the use of that name in interstate commerce; and (3) its use by another in a manner likely to cause confusion as to the origin of the goods or services.

*Calamari Fisheries*, 698 F.Supp. at 1006 (citation omitted).

Digital has clearly satisfied the first two of these requirements: It is the owner by use and assignment of the distinctive mark "AltaVista," a mark used in commerce both by Digital and ATI. I turn then to the likelihood of confusion caused by any unlicensed, unauthorized uses of "AltaVista."

"[L]ikelihood of confusion is 'an essential element of a claim of trademark infringement,' whether it arises under state or federal law." *Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1205 (1st Cir.1983) (quoting *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 486–87 (1st Cir. 1981)).[41] In *Pignons*, the First Circuit established the following non-exhaustive list of factors used in assessing the "likelihood of confusion" between marks:

> the similarity of the marks; the similarity of the goods; the relationship between the parties' channels of trade; the relationship between the parties' advertising; the classes of prospective purchasers; evidence of actual confusion; the defendants' intent in adopting its mark; and the strength of the plaintiff's mark.

*Id.* at 487; *see also Astra*, 718 F.2d at 1205 (enumerating the *Pignons* test, noting these factors are "to be used as guides in assessing the likelihood of confusion"); *Aktiebolaget Electrolux v. Armatron Int'l, Inc.*, 999 F.2d

---

Nor at this point would even ATI's complete compliance with the license moot the granting of a preliminary injunction against it. *See Pic Design Corp. v. Bearings Specialty Co.*, 436 F.2d 804, 809 (1st Cir.1971) ("In view of the extent of defendant's apparent misconduct and the lateness of its attempts at reformation, we find no abuse of discretion on the part of the district court in granting this injunction.").

**40.** "Unfair competition is almost universally regarded as a question of whether the defendant is passing off his goods or services as those of the plaintiff by virtue of substantial similarity between the two, leading to confusion on the part of potential customers." *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1010 (5th Cir.), *cert. denied* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975).

Since "the same facts which would support an action for trademark infringement would also support an action for unfair competition," *id.*, I will deal with the two claims in combined fashion, referring to them for the remainder of this opinion as trademark infringement claims.

**41.** Since servicemarks (which "distinguish one's services from those offered by others") and trademarks are for the most part functional equivalents, "the distinction between the two types of marks is irrelevant ... [and] cases discussing either apply." *Boston Athletic Ass'n v. Sullivan*, 867 F.2d 22, 23, n. 1 (1st Cir.1989). For the present case it is irrelevant that ATI has used AltaVista as both a servicemark for its Website and as a trademark for its software products.

1, 4 (1st Cir.1993) ("No one factor is conclusive as to likelihood of confusion, and the district court must consider each."). I turn then, to an application of *Pignons'* eight factors to the trade and servicemark "Alta-Vista."

### 1. Similarity Of The Two "AltaVista" Marks

The two marks at issue are remarkably similar; "similarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." *Pignons,* 657 F.2d at 487 (internal quotation marks and citation omitted). The *Pignons* court held:

> We and other courts have indicated that in certain circumstances, otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer.

*Id.* at 487 (citations omitted); *Astra Pharmaceutical,* 718 F.2d at 1205 ("It is well settled that under certain circumstances otherwise similar marks are not likely to be confused where used in conjunction with the clearly displayed name and/or logo of the manufacturer."). Here, however, ATI's logo, a mountain range through which runs the word "AltaVista," is markedly similar to Digital's "AltaVista" logo. The total similarity between the two marks as they are used on the parties' respective Web-sites is unmistakable.

Courts consider the totality of circumstances surrounding the use of the marks: "Similarity of the marks must be considered in light of what occurs in the marketplace, taking into account the 'circumstances surrounding the purchase of the goods' or services." *Calamari Fisheries,* 698 F.Supp. at 1009 (citation omitted). Both parties use "AltaVista" as integral parts of Websites, both in the context of offering Web search services.

Digital has satisfied its burden of demonstrating that the two marks evaluated in the context of their use on Internet Web-sites offering similar services are strikingly similar in "total effect."

### 2. Similarity Of The Goods And Services

Both companies provide search engine services, Digital its own, and ATI, Digital's (via a "framed" link thereto). Both companies sell computer software under the "AltaVista" mark. Both companies utilize their Websites to advertise: Digital its own products and services, ATI, others'. *See Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1338, 1341 (E.D.Mo.1996). Their goods and services are for all intents and purposes the same. *Id.*

### 3. Channels Of Trade/Advertising/Marketing

"The overlap between the parties' trade channels, advertisers, and markets are three factors conventionally analyzed together." *Copy Cop, Inc. v. Task Printing, Inc.,* 908 F.Supp. 37, 45 (D.Mass.1995). Here, again, there can be no serious dispute that both parties are now direct competitors in the same trade, selling computer software and Internet services, and that they compete for the same class of prospective purchasers, namely users of the Web. Both Digital and ATI also advertise their own products and services on their respective Web-sites.

### 4. Actual Confusion

"Actual confusion is often taken to be the most persuasive possible evidence that there is a likelihood of confusion." *Id.* (citation omitted). Digital has introduced evidence of actual confusion, including a *Wall Street Journal* article of October 18, 1996, that observes *inter alia:* "Every day, hundreds of thousands of Web users looking for Digital's AltaVista (www.altavista.digital.com) accidentally call up the home page for Jack Marshall's AltaVista (www.altavista.com)." David Kirkpatrick, *Tale of Two AltaVista WebSites Teaches Useful Marketing Lesson,* WALL ST. J. (October 18, 1996), at B18. This may be serious *actual* confusion of users. Advertisers may have also been confused; according to the same article:

> [T]here are some advertisers who thought they were buying space on the popular Digital site-which boasts some 20 million "hits" each day. Auto–by–Tel's Mr. Davis says he believed that the two sites were related-until a Wall Street Journal reporter explained the distinction. "Frankly, I

wasn't aware" there was any difference, he says.

*Id.* The evidence of actual confusion of both advertisers and consumers obviously weighs strongly in Digital's favor.

### 5. ATI's Intent In Adopting The "AltaVista" Mark

ATI has attested to the fact that it uses "AltaVista" in anticipation of benefiting from Digital's use of the mark. The license agreement, however, specifies that "any and all use of the Mark shall inure to the benefit of Digital" which is "the sole and exclusive owner of the Mark, and the goodwill associated therewith." I find that ATI has used and uses AltaVista as a trade and service mark precisely to capture some of the benefits of Digital's use of the mark, and goodwill associated therewith.

### 6. The Strength Of The "AltaVista" Mark

In trademark law, the spectrum of categories into which any mark involving words may fall, "in their ascending order of eligibility for protection . . . are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary and fanciful." *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir.1979). Generic marks are entitled to the least protection (if any), while arbitrary and fanciful marks, such as Kodak or Polaroid, and suggestive marks, like American Express or Visa, are entitled to the most protection against infringement. AltaVista is a suggestive mark, a strong and well known mark into which significant amounts of money and energy have been invested, and as such it is entitled to very strong protection. *Copy Cop*, 908 F.Supp. at 46. Again, this factor strongly favors Digital.

All told, there is a strong likelihood of confusion between ATI's AltaVista Web-site and Digital's. ATI's Web-site is a service, one that sells advertising space and software, and also functions as a gateway to Digital's AltaVista search service site. ATI's uses of the "AltaVista" mark on its Web-site are unauthorized and may cause tremendous confusion among Web users, both consumers and advertisers alike.

### V. CONCLUSION

Digital has met its burden of proving the likelihood that ATI has breached its license to use the "AltaVista" mark. Preliminary injunctive relief, designed to stop irreparable harm that could be caused by such confusion, is therefore appropriate here. Any harm to ATI caused by this injunction does not outweigh harm that might be done to Digital by the ongoing infringement of its mark.

The World–Wide Web is growing at a tremendous pace, with new sites and multitudes of new users everyday. Digital has acquired the right to control the use of the AltaVista mark, and nothing in its license with ATI allows the defendant to capitalize on Digital's significant investments of time, energy, and money in creating one of the most recognized marks in use on the Web. Moreover, in the Internet arena, where "surfing" (moving quickly from Web-page to Web-page) is a prevalent activity the harm to Digital may be exacerbated. A user "surfing" sites may easily be confused into thinking ATI's "AltaVista" Web-site belongs to Digital. Moreover, it is a harm that may be felt especially in Massachusetts, where Digital is located and where Internet users are therefore more likely to be aware of AltaVista, and correspondingly more likely to be confused by ATI's Web-site.

Confusion may well be lessened by express compliance with the license agreement: ATI's recent efforts at compliance with the license agreement, however, are a classic case of too little, too late.

ATI is therefore **ENJOINED** as set forth in the accompanying **ORDER.**

**SO ORDERED.**

### ORDER

After hearing on plaintiff Digital Equipment Corporation's ("Digital") motion for preliminary injunction, it is hereby ORDERED that, until final adjudication of this matter, defendant Altavista Technology, Inc. ("ATI") and its officers, directors, employees. agents, subsidiaries, distributors, dealers, and all persons in active concert or partic-

ipation with any of them are hereby restrained and enjoined from:

(1) using the AltaVista mark in any fashion other than as part of the (i.e., Internet address) "http://www.altavista.com" and as part of ATI's full corporate name "AltaVista Technology, Inc." in which each element of the full corporate name is displayed in the same form including but not limited to size, typeface, and color;

(2) using the AltaVista mark as permitted in subpart (1) above unless ATI's Web page at http://www.altavista.com and every other web page at that site prominently displays the following disclaimer in font size that is at least 4 points larger than the font size of 80% of the text on the Web page and is visible when each such page is accessed:

**Altavista Technology, Inc. is not affiliated with Digital Equipment Corporation, AltaVista Internet Software, Inc. or the AltaVista Internet Search Service. The AltaVista Internet Search Service may be found at http://www.altavista.digital.com.**

(3) using the AltaVista mark as a trademark or service mark to identify any product or service offering, including but not limited to software products and advertising services;

(4) using on its Web page at http://www.altavista.com or elsewhere, a link (without any search boxes), direct or indirect, to Digital's AltaVista Internet Search Service that creates the false impression that ATI's Web site is Digital's AltaVista Search Service; and

(5) otherwise infringing or diluting in any manner the AltaVista mark or making any unauthorized use of the AltaVista mark.