**COOLSAVINGS.COM, INC., Plaintiff,**

v.

**IQ.COMMERCE CORPORATION,
Defendant.**

No. 98 C 7750.

United States District Court,
N.D. Illinois,
Eastern Division.

June 10, 1999.

Thomas G. Scavone, Christopher J. Lee, Sally Wiggins, David J. Sheikh, Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for Interactive Coupon Marketing Group, Inc., dba Coolsavings, plaintiff.

Melvin F. Jager, Laura Beth Miller, Brinks, Hofer, Gilson & Lione, Chicago, IL, Henry C. Bunsow, Townsend, Townsend, Khourie & Crew, San Francisco, CA, Karin Kramer, Keker & Van Nest L.L.P., San Francisco, CA, for IQ. Commerce Corporation, defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, Chief Judge.

Plaintiff CoolSavings—a Michigan corporation having its headquarters and principal place of business in Chicago—sued defendant IQ.Commerce Corporation ("IQ") for infringement of United States Patent No. 5,761,648 ("the '648 patent"). The '648 patent claims a data processing system that allows CoolSavings to issue electronic certificates (advertisements and coupons) over interactive online networks, such as the Internet. Customers who enroll on CoolSavings's web site are presented with a list of offers from advertisers such as retail stores and restaurants for specific products, and they can download and print these offers in the form of coupons on their personal computer printers. The merchants who pay CoolSavings to be featured on the web site can gather demographic and other information—submitted by the consumers upon their enrollment with CoolSavings's program—about the consumers who choose their coupons.

IQ was incorporated in California in 1995 and has its principal and only place of business in Saratoga, California. IQ has developed a number of systems intended to make various savings programs and promotions offered by merchants available to consumers over the Internet, including coupons, sweepstakes, rebates, and gift certificates. At issue in this case is IQ's couponing program, "iSave." When this lawsuit was filed, iSave was still in its test phase, and IQ had not yet derived any income from it, but IQ hopes eventually to get from subscribing merchants a percentage of the sales generated by iSave.

To enroll with iSave, consumers must provide basic information about themselves (name, e-mail address, age, and gender) to IQ's web site. iSave "members" can click on a button that causes a coupon to "pop up" on the screen. Once the coupon appears, if the consumer is interested in the product, she may either "clip" it electronically and thereby save it in her "account" for potential later use, or click on the "buy" button, which links her directly to the merchant's web site, where she will have the option of purchasing the product at a discount with the coupon. It is this system which CoolSavings believes infringes the '648 patent. The coupon clipping service is free for iSave members.

When IQ filed its motion to dismiss for lack of personal jurisdiction, which is the primary focus of this opinion, about 299 people had signed up as iSave members, 11 of whom were from Illinois.[1] Some of

---

1. The deposition of IQ's C.E.O. Carl Meyer reveals that by the date of the deposition (two months after the motion to dismiss was filed) 367 people had signed up for iSave, 20 of

those 11 stopped after the "pop-ups," some electronically "clipped" coupons, and some clicked the "buy" button. IQ does not know whether those who elected to "buy" actually completed purchases at the merchants' web sites, and because IQ has not yet registered any merchants (the program is still in its test phase), IQ will receive nothing even if any purchases were completed. IQ has, however, made a concerted effort to market its capabilities and find interested merchants, through the Chicago-based advertising and marketing firm of Frankel & Company.

■ As a plaintiff which has taken discovery on personal jurisdiction matters,[2] CoolSavings must prove by a preponderance of the evidence that jurisdiction exists. *See Graphic Controls Corp. v. Utah Med. Prods.,* 149 F.3d 1382, 1383 n. 1 (Fed.Cir.1998); *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990). As a federal district court sitting in Illinois, we exercise personal jurisdiction to the maximum extent permitted by the federal constitution. *See North Am. Philips Corp. v. American Vending Sales, Inc.,* 35 F.3d 1576, 1578 (Fed.Cir.1994); 735 ILCS 5/2–209(c). In order to subject a non-resident defendant to personal jurisdiction, "due process requires [that] he have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The Su-

preme Court has made it clear that the required minimum contacts must be *purposeful,* so that non-residents may anticipate being subjected to litigation in the forum as a result of their activities. *See Burger King v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■ CoolSavings argues that we have specific jurisdiction over IQ, which is jurisdiction "arising out of or related to the defendant's contacts with the forum," as opposed to general jurisdiction based on "continuous and systematic" business contacts between the defendant and the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The question before us, then, is whether IQ purposefully directed its activities at residents of Illinois, and whether CoolSavings's claims arise out of or relate to those activities. *See Burger King,* 471 U.S. at 472–73, 105 S.Ct. 2174. Then, even if we decide that IQ did purposefully establish minimum contacts within Illinois, we must consider those contacts in light of other factors to determine whether asserting personal jurisdiction would be reasonable and fair. *See id.* at 476, 105 S.Ct. 2174. Because this is a patent infringement case, we are guided by Federal Circuit law rather than Seventh Circuit law, even with respect to personal jurisdiction issues, due to the Federal Circuit's exclusive jurisdiction over patent appeals. *3D Systems, Inc. v. Aarotech Labs., Inc.,* 160 F.3d 1373, 1377–78 (Fed.Cir.1998).

■ We hold that by setting up an interactive web site directed at the entire

---

whom were from Illinois, and Meyer admitted that some members who had not supplied their zip codes upon registering could also be Illinois residents. *See* Dep.Tr. of Carl Meyer, at 84–85, 95–96. However, as we will explain shortly, the exact number of people from Illinois who used the technology is not critical to our analysis.

**2.** We recognize that the documents filed since the plaintiff's limited discovery were filed under seal, pursuant to the stipulated protective order issued by this Court. So far as we can

tell, however, nothing in this opinion reveals any "trade secrets, competitively sensitive information or other confidential information." Agreed Protective Order of 4/9/99, at ¶ 3. We are not saying that the sealed documents will now become public record, but simply that we are issuing "an opinion that addresses motions supported by documents filed under seal." *S. Industries, Inc. v. Stone Age Equipment, Inc.,* 12 F.Supp.2d 796, 799 n. 2 (N.D.Ill.1998).

country, knowing and hoping that residents of all states would use it, and by using a Chicago-based marketing firm to promote its capabilities using the disputed technology, IQ purposefully established minimum contacts with Illinois.[3] It is undisputed that IQ intended its program to be accessible by residents of all states, and that a number of Illinois residents did become iSave members. IQ's argument that its contacts with Illinois were negligible because Illinois residents' activity on its site amounted to only one-half of one percent of the total site activity is unpersuasive. We are dealing with specific personal jurisdiction, and IQ's forum-related conduct—making its technology available for use by Illinois residents—forms the basis of the alleged infringement. Whether IQ's contacts are substantial and continuous is irrelevant. It is enough that IQ's couponing program, targeted at residents of all states, was accessed by people in Illinois. Both the Federal Circuit and the Supreme Court have observed that "[e]ven a single act can support jurisdiction" if it creates a "substantial connection" with the forum, and not merely an "attenuated affiliation" so long as it is directly related to the plaintiff's claim. *Red Wing Shoe Co.,* 148 F.3d at 1359 (quoting *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174). It may seem unfair to subject IQ to personal jurisdiction almost anywhere in the country, but to us it seems even more unfair to allow IQ to introduce its program to the entire country while remaining subject to

personal jurisdiction only in its home state and thus requiring patentees from all over the country to go to California in order to litigate their infringement claims. *Accord Digital Equip. Corp. v. AltaVista Tech., Inc.,* 960 F.Supp. 456, 471 (D.Mass.1997).

We need not rest our finding of specific personal jurisdiction on that ground alone, however, because IQ also regularly dealt with a Chicago-based advertising and marketing firm—in person, on the phone, and by e-mail—with whom it worked to stimulate interest in the iSave product at issue here. IQ and Frankel worked on strategies for promoting and selling IQ's technology to Frankel's clients, a number of whom are based in Chicago. Frankel made presentations in Chicago of which IQ was aware demonstrating IQ's technology, and IQ's officers went to Chicago to meet with Frankel representatives. These are purposeful contacts, not "the unilateral activity of another party or third person" that the Supreme Court warned us against attributing to a defendant for jurisdiction purposes. *Burger King,* 471 U.S. at 475 & n. 17, 105 S.Ct. 2174; *see also Red Wing Shoe Co.,* 148 F.3d 1355, 1361 (Fed.Cir. 1998).

Contrary to IQ's contentions, its contacts with Frankel were not "random," "fortuitous," or "attenuated." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. IQ was originally introduced to Frankel by VISA, one of Frankel's clients, when VISA

---

**3.** Other courts facing personal jurisdiction challenges in cases involving "web" contacts have divided those cases into three categories. In the first category are the cases where the defendant actively transacted business (e.g. sold goods) over the Internet; personal jurisdiction is warranted. In the second are those where personal jurisdiction is deemed improper because the defendant has simply posted information on a "passive" web site, making that information available to Internet users. The third category is the "middle ground," cases involving interactive web sites, where a user can exchange information with the host computer. *See, e.g., Vitullo v. Velocity Powerboats, Inc.,* No. 97 C 8745, 1998 WL 246152, at \*5 (N.D.Ill. Apr. 27, 1998). It

seems that this case breaks the mold—it does not fit neatly into any of the categories. While the closest category appears to be the third, because the iSave web site allows for the exchange of information but does not transact business, this case is unusual because the use of the interactive technology *itself* allegedly infringes the plaintiff's patent. Specific personal jurisdiction depends on the nature and quality of the defendant's contacts with the forum, so obviously a case in which the contact itself is the wrong is a stronger case for jurisdiction than one in which the contact merely relates to the wrong. We do not think it productive to try to jam this square peg into a round hole.

was interested in implementing a couponing program using IQ's technology whereby consumers who bought items on-line using their VISA credit cards would get a discount. While the project ultimately fell apart in contract discussions, IQ worked closely with Frankel over the course of approximately six to seven months, trying to work out operational details and get the program running—even attending two or three meetings about it, in Chicago, and communicating on a regular basis with Frankel's reps, both on the phone and via e-mail.

IQ then developed a relationship with Frankel that was separate from and independent of the VISA project. IQ was eager to do business with Frankel and hoped that Frankel would promote its couponing technology among its other corporate clients. A number of e-mail messages were exchanged between IQ's leadership and Frankel's representatives, including one alerting IQ to an article about the success of CoolSavings's couponing program. Frankel pitched IQ's technology to one of its Chicago-based clients, Rolling Stone Network/JAMtv, demonstrating IQ's technology to Rolling Stone at meetings in Chicago. While IQ did not send any representatives to these meetings, IQ was aware that Frankel was engaged in this promotional activity on its behalf. Frankel also demonstrated IQ's technology to a company called @Home, in Chicago, as a potential joint business opportunity.

IQ later sent one of its officers to Chicago, in an effort to "cement" the relationship between IQ and Frankel so that Frankel would generate more interest in IQ's technology among Frankel's clients. During this trip to Chicago, the IQ officer met with Bud Frankel, the founder of Frankel & Co., and "explained to Bud what we do and the potential of what we could do together and tried to get him excited about the whole Internet thing," as IQ's C.E.O. put it in his deposition. Later, IQ's vice president of business development flew to Chicago for a meeting with

Frankel and Target about the possibility of doing a joint project using IQ's technology. IQ also tried, with Frankel's help, to do business with Encyclopedia Britannica, also one of Frankel's clients. The communication between IQ and Frankel regarding this project was conducted by phone and by e-mail. One of Frankel's people later sent an e-mail message to IQ, suggesting that IQ might be interested in doing a couponing or rebating project with a digital wallet company called eWallet.com. Then, when Frankel presented Microsoft with a promotional offer for MSNetwork, Frankel included IQ's couponing, rebate, and sweepstakes capabilities in the package deal. IQ conferred with Frankel in the development of that portion of the presentation. None of these projects were ever successfully launched, and IQ and Frankel are not currently doing business together, but IQ's C.E.O. testified in his deposition that he last communicated with one of Frankel's reps, with whom he became friendly during the course of their work together, in a telephone conversation a month prior to his deposition.

We conclude that IQ's web site activity in Illinois, coupled with its contacts with Frankel, suffice to confer specific personal jurisdiction over IQ in Illinois for this patent infringement case. IQ's contacts were purposeful, and they involved the use of the technology that is the subject of this suit. The fact that none of the projects planned by IQ and Frankel came to fruition is irrelevant, as we are analyzing personal jurisdiction here, not the question of infringement.

■ Even though we have decided that IQ purposefully established minimum contacts with Illinois, we must now consider those contacts "in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.'" *Burger King*, 471 U.S. at 476, 105 S.Ct. 2174 (quoting *International Shoe*, 326 U.S. at 320, 66 S.Ct. 154). The burden is on IQ to

make "a compelling case that jurisdiction would be constitutionally unreasonable." *Akro,* 45 F.3d at 1546. And the Federal Circuit has noted that "[i]n general, these cases are limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan,* 21 F.3d at 1568 (citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174).

This is not one of those cases. Illinois has a strong interest in adjudicating injuries that occur within the state, and this interest extends to patent infringement actions. *See id.* Even though the burden on IQ of defending a lawsuit in Illinois may be significant, "it is recognized that 'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.'" *Id.* at 1569 (quoting *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). And the fact that it is advantageous to CoolSavings to litigate in its chosen forum "does not militate against its right to have access to that court." *Id.* at 1568. IQ has not made a compelling case that asserting personal jurisdiction over it would be constitutionally unreasonable.

■ IQ has also moved to transfer this case to the Northern District of California pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses and in the interest of justice. We may transfer venue if IQ demonstrates that (1) venue is proper in our district; (2) venue is proper in California; and (3) transfer will best serve the convenience of the parties and witnesses as well as the interest of justice. *See SRAM Corp. v. SunRace Roots Enter. Co.,* 953 F.Supp. 257, 259 (N.D.Ill.1997). We know that venue is proper in this district, because "[t]he venue issue is subsumed in the personal jurisdiction issue." *North Am. Philips Corp.,* 35 F.3d at 1577 n. 1 (citing *VE Holding*

*Corp. v. Johnson Gas Appliance Co.,* 917 F.2d 1574 (Fed.Cir.1990) (venue in a patent infringement case "includes any district where there would be personal jurisdiction over the corporate defendant at the time the action is commenced")). So because we find the exercise of personal jurisdiction over IQ to be proper here, venue is proper here.

Venue is also proper in the Northern District of California, since that is IQ's place of incorporation and principal place of business. *See* 28 U.S.C. § 1391(b). However, in order to convince us to transfer this case under § 1404(a), IQ must show that the Northern District of California is " 'clearly more convenient' " than is this district. *Greene Manuf. Co. v. Marquette Tool & Die Co.,* No. 97 C 8857, 1998 WL 395155, at *1, 1998 U.S. Dist. LEXIS 10656, at *3 (N.D.Ill. July 9, 1998) (quoting *Heller Fin., Inc. v. Midwhey Powder Co., Inc.,* 883 F.2d 1286, 1293 (7th Cir.1989)). In evaluating the convenience and fairness of transfer, we look at both the private interests of the parties and the public interest of the Court.

The first private interest we consider is the plaintiff's choice of forum, which we give substantial weight unless the choice of forum lacks any significant connection to the claim. *See id.* 1998 WL 395155, at *1, LEXIS at *4. CoolSavings's principal place of business is Chicago and most of its officers and employees live here. Even though most of IQ's officers and employees are located in California and that is where IQ's couponing program was developed, we have already explained that the events giving rise to this cause of action took place all over the country, wherever IQ has allegedly used the patented technology to make its couponing program accessible to merchants and customers. Also, IQ chose Frankel, a Chicago-based firm, to market and promote the allegedly infringing technology. Therefore, Chicago's connection to the claim is not insignificant, so we give CoolSavings's choice of forum substantial weight in our analysis.

Second, we look at the situs of material events. *See id.* 1998 WL 395155, at *1, LEXIS at *4. While some of the material events occurred in this district—such as those on which we based our finding of personal jurisdiction—we recognize that many of the events surrounding CoolSavings's claim of infringement probably took place in California, where IQ and its employees are located and presumably incorporated the allegedly infringing technology into and launched their iSave program. As IQ points out, intellectual property cases typically focus on the infringer's place of business. *See, e.g., GEN 17, Inc. v. Sun Microsystems, Inc.,* 953 F.Supp. 240, 243 (N.D.Ill.1997). This factor thus weighs in favor of transfer.

The third factor we consider is the relative ease of access to sources of proof in each forum, including the power of the Court to compel the appearance of witnesses and the costs of obtaining the attendance of witnesses. *See Greene Manuf. Co.,* 1998 U.S. Dist. LEXIS 10656, at *4. In this case, both locations are likely to be sources of proof, since most of the executives and employees of the two companies are either in Northern California or in the Chicago area, but arguably IQ's employees and records will be the focus of discovery since IQ's allegedly infringing activity is the subject of this lawsuit. On the other hand, CoolSavings claims that Frankel's employees, located in Chicago, may be called as witnesses. As non-parties, these witnesses would be outside of the subpoena power of the Northern District of California, *see id.* at *8–9, whereas the witnesses that IQ has identified thus far are all employees of the company who would be subject to compulsory process in this Court. Furthermore, we agree with CoolSavings that the location of relevant documents does not significantly favor transfer to California, because no matter where the trial is held, all relevant documents—regarding both the patented invention and the allegedly infringing technology—will have to be collected, copied, and sent to the offices of trial counsel in both San Francisco and Chicago. And, as we pointed out earlier, modern technology has made it easier and cheaper to transfer information than ever before. We therefore conclude that the location of sources of proof does not weigh heavily in favor of either location.

The final private interest factor is the convenience to the parties, comparing their respective residences and abilities to bear the expense of a trial in a particular forum. *See id.* 1998 WL 395155, at *1, LEXIS at *4. While we understand that it will be inconvenient for IQ to defend against this lawsuit in Chicago, it would be equally inconvenient for CoolSavings to litigate in California, and we will not transfer this case if doing so " 'merely transforms an inconvenience for one party into an inconvenience for another party.' " *Id.* 1998 WL 395155, at *1, LEXIS at *3 (internal citations omitted). IQ claims that its burden would be disproportionate given the fact that it is a new, small company of only 24 employees that is still operating at a loss. However, CoolSavings has only about 60 employees and is also a relatively young company, and absent any information about its revenue or profits, it is not at all clear to us that CoolSavings is in a substantially better position than IQ to engage in litigation in a distant forum. The one case that IQ cites for its argument is distinguishable from this one, as in that case the plaintiff employed over 500 people and had expected sales of about $50,000,-000, while the defendant had only five employees. *See SRAM Corp.,* 953 F.Supp. at 260. The disparity we are presented with is not nearly so striking.

The public interest factors, including the court's familiarity with the applicable law and the desirability of resolving a case in a particular forum, *see SRAM Corp.,* 953 F.Supp. at 260, also weigh against transfer. Patent infringement is a federal question, and both district courts are equally competent to hear and decide issues of federal law. *See GEN 17,* 953 F.Supp. at 243. Furthermore, as we observed earlier, Illinois has a strong interest in adjudicat-

ing injuries to its citizens' intellectual property rights. We are unaware of any public interest in transferring this case to California.[4] In all, the only fact favoring transfer is that California is the likely situs of some of the material events. The other factors either balance evenly or cut the other way. Because this does not persuade us that sending this case to the Northern District of California would be "clearly more convenient" than keeping it here, we will not disturb CoolSavings's choice of forum.

We deny both IQ's motion to dismiss for lack of personal jurisdiction and its motion to transfer venue to the Northern District of California. It is so ordered.

---

4. IQ suggests in its motion that cases are disposed of more quickly in the Northern District of California than in the Northern District of Illinois, but in support of that proposition it cites only one case, in which one of our district judges granted a motion to transfer to California noting the *absence* of proof that the case would proceed any faster through the Northern District of Illinois than it would in the Northern District of California. *See SRAM Corp.,* 953 F.Supp. at 260. In fact, for the twelve-month period ending September 30, 1998, the median time for disposition of civil cases filed in this district was six months, while for civil cases filed in the Northern District of California it was eight months. *See Federal Court Management Statistics: Judicial Caseload Profile* (published by the Administrative Office of the United States Courts) (visited May 20, 1999) <http://www.ilnd.uscourts.gov/Crtstats.htm>.